UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE GUARDIAN LIFE INSURANCE COMPANY,

                 Plaintiff,

     -v-

NANETTE S. GILMORE, BARBARA GILMORE-SMIT, and APPLEBEE-McPHILLIPS FUNERAL HOME, INC.,

             Defendants.

Case No. 13-CV-2677 (KMK)

OPINION AND ORDER

<u>Appearances</u>:

Robert D. Meade, Esq.
Bleakley Platt & Schmidt, LLP
White Plains, NY
*Counsel for Plaintiff The Guardian Life Insurance Company*

Joseph M. Saffioti, Esq.
Saffioti and Anderson
Newburgh, NY
*Counsel for Defendant Nanette S. Gilmore*

Barbara Gilmore-Smit
Brooksville, FL
*Pro Se Defendant*

KENNETH M. KARAS, District Judge:

       Plaintiff The Guardian Life Insurance Company ("Guardian") brings this Interpleader

Action under 28 U.S.C. § 1335, seeking, among other forms of relief, discharge from all liability

in connection with a life-insurance policy ("the Policy") that it issued to Robert C. Gilmore

("Decedent") in 1984.  Following Decedent's death in 2013, three Parties asserted entitlement to

all or part of the Policy's proceeds: Defendant Nanette S. Gilmore ("Gilmore"), Decedent's wife;

Defendant Barbara Gilmore-Smit ("Gilmore-Smit"), Decedent's mother; and Defendant

Applebee-McPhillips Funeral Home, Inc. ("Applebee-McPhillips"), the funeral home that provided funeral services to Decedent's family after his passing.  Gilmore has moved for summary judgment against Gilmore-Smit and Applebee-McPhillips, claiming that, as the Policy's sole beneficiary, she is entitled to all of its proceeds, and that she has paid Applebee-McPhillips the full amount of the bill for Decedent's funeral expenses.  For the following reasons, the Court grants some, but not all, of the relief that Guardian requests, and grants in part and denies in part Gilmore's Motion for Summary Judgment.

## I.  BACKGROUND

### A.  Factual Background

The following facts are undisputed.  On or about April 3, 1984, Guardian issued the Policy to Decedent.  (*See* Gilmore's Statement of Material Facts Pursuant to Local Rule 56.1 ("Gilmore's 56.1 Statement") ¶¶ 1, 3 (Dkt. No. 20); Letter from Gilmore-Smit to the Court (June 24, 2013) ("June 24 Gilmore-Smit Letter") (Dkt. No. 8) ("[Decedent] has had [the Policy] since April 3, 1984.").)  The Policy had an initial face amount of $100,000.  (*See* Gilmore's 56.1 Statement ¶ 2.)  Decedent originally named Gilmore-Smit as the Policy's beneficiary.  (*See id.* ¶ 4; June 24 Gilmore-Smit Letter ("[Decedent] told [Gilmore that] he was going to keep [Gilmore-Smit] as . . . beneficiary of [the Policy] . . . .").)  However, approximately 28 years after Guardian issued the Policy, on or about April 25, 2012, Decedent filed a change-of-beneficiary form ("the Form") with Guardian, through which form Decedent appears to have sought to change the Policy's beneficiary from Gilmore-Smit to Gilmore.  (*See* Gilmore's 56.1 Statement ¶ 5; *id.* Ex. A ("Change of Beneficiary Form"); June 24 Gilmore-Smit Letter ("[T]he beneficiary was changed [in] April 2012 . . . .").)  In keeping with Guardian's requirements,

2

Janet Mosner ("Mosner"), a New Jersey notary public, notarized the Form. (*See* Change of Beneficiary Form; Aff. of Janet Mosner ("Mosner Aff.") ¶¶ 1, 3–4 (Dkt. No. 17).)

Decedent died on February 5, 2013, approximately nine months after he filed the Form. (*See* Gilmore's 56.1 Statement ¶ 6; *id.* Ex. B ("Certificate of Death"); June 24 Gilmore-Smit Letter (describing Decedent's death as occurring on February 5, 2013).) Decedent's death certificate lists his immediate cause of death as liver cancer, due to or as a consequence of cirrhosis and alpha-1 antitrypsin deficiency. (*See* Certificate of Death; *see also* June 24 Gilmore-Smit Letter (describing Decedent's liver cancer).) Three days later, on February 8, 2013, Applebee-McPhillips filed an Insurance Proceeds Assignment ("the Assignment") with Guardian, through which it sought $7,475 of the Policy's proceeds for the payment of Decedent's funeral expenses. (*See* Gilmore's 56.1 Statement ¶ 9.) The Assignment was signed by Gilmore. (*See id.*) Approximately one month later, on March 6, 2013, Gilmore filed a Claimant's Statement with Guardian, through which she sought to recover the entirety of the Policy's proceeds. (*See* Gilmore's 56.1 Statement ¶ 7; *id.* Ex. C.) As of the date of Decedent's death, such proceeds totaled $164,777, with interest payable from that date at the rate of three percent per year. (*See* Gilmore's 56.1 Statement ¶ 11.) Gilmore-Smit thereafter notified Guardian that she contested Gilmore's claim to such proceeds. (*See id.* ¶ 8.)

There are only two facts in dispute in this Action. The first is whether Decedent had the mental capacity to execute the Form changing the Policy's beneficiary from Gilmore-Smit to Gilmore in April 2012. In a letter that she submitted to the Court before Gilmore filed her Motion, Gilmore-Smit stated that she "think[s]" that, in the months leading up to Decedent's death, Decedent "was on heavy doses of morphine due to . . . ammonia on the brain," and that as a result, "he was not of sound mind," and "unknowingly signed something . . . which changed

3

the beneficiary or gave someone power of attorney to do so."  (June 24 Gilmore-Smit Letter.)

For her part, Gilmore states that "the presumption by law is that [Decedent] had legal capacity to

change the beneficiary of [the Policy,] and that no evidence has been given to overcome this

presumption."  (Gilmore's Mem. of Law in Supp. of Mot. for Summ. J. ("Gilmore's Mem.") at

unnumbered 1 (Dkt. No. 21).)  Gilmore has also submitted various affidavits through which she

seeks to show that Decedent was in fact capable at the time that the Form was executed.  (*See*

Mosner Aff.; Aff. of Irene Lynn Labate Vanatta ("Vanatta Aff.") (Dkt. No. 18); Aff. of Nanette

S. Gilmore ("Gilmore Aff.") (Dkt. No. 19).)

The second fact in dispute is whether, as Gilmore claims, "the Applebee-McPhillips

funeral bill was paid in full out of [Gilmore's] personal funds," which would mean that

"Applebee-McPhillips no longer has any rights to any portion of the insurance proceeds."

(Gilmore's 56.1 Statement ¶ 10.)  Gilmore has submitted what appears to be a May 13, 2013

funeral bill from Applebee-McPhillips, at the bottom of which Applebee-McPhillips appears to

state, "Thank you, the funeral expenses for Robert are paid in full."  (*See id.* Ex. D ("Funeral

Bill").)  Applebee-McPhillips has failed to appear or take any action in this matter.

B.  Procedural Background

Guardian filed an Interpleader Complaint on April 23, 2013.  (*See* Compl. (Dkt. No. 1).)

In its Complaint, Guardian states that it "is indifferent and disinterested as to which of . . .

[D]efendants is entitled to the proceeds of the [P]olicy or to the division of the proceeds among

them"; that it is "unable to determine to whom the amount due under the [P]olicy is payable" or

"which of . . . [D]efendants is entitled to payment"; and that, as a result, it "is, or may be,

exposed to multiple liability."  (*Id.* ¶¶ 21–22.)  Accordingly, Guardian seeks the following relief:

(1) That each of . . . [D]efendants be restrained from instituting or maintaining any action against [Guardian] for the recovery of the proceeds of [the Policy] or any action seeking any part of these proceeds;

(2) [An order] [r]equiring [D]efendants to interplead together concerning their claims to the proceeds;

(3) That upon payment of the proceeds of the . . . [P]olicy into the Registry of this Court that [Guardian] be discharged from all further liability on the [P]olicy or for the proceeds payable on it;

(4) For such other and further relief as the Court deems just and proper, together with expenses, costs and disbursements of this [A]ction payable from the proceeds of the . . . [P]olicy.

(*Id.* at 4.)

A summons was issued to Applebee-McPhillips, Gilmore, and Gilmore-Smit on the same day that Guardian filed its Complaint. (*See* Summons (Dkt. (minute entry for Apr. 23, 2013)).) On May 10, 2013, Guardian sent Gilmore-Smit a waiver of the service of summons, an executed version of which Gilmore-Smit returned on June 5, 2013. (*See* Waiver of Service Returned Executed (Dkt. No. 2.).) Guardian sent the waiver that Gilmore-Smit returned to an address in Brooksville, Florida. (*See id.*) On June 27, 2013, Gilmore answered Guardian's Complaint and filed a cross-claim against Gilmore-Smit, (*see* Answer and Cross-Claim (Dkt. No. 6)), a copy of which Gilmore sent to the same Brooksville, Florida address to which Guardian sent the waiver, (*see* Aff. of Service of Answer and Cross-Claim (Dkt. No. 7)). Gilmore-Smit responded in a letter that she submitted to the Court on July 1, 2013. (*See* June 24 Gilmore-Smit Letter.)

On September 17, 2013, Gilmore submitted a pre-motion letter to the Court, in which letter she requested that the Court schedule a pre-motion conference. (*See* Dkt. No. 9.) The Court granted Gilmore's request, (*see id.*), and scheduled a conference for October 4, 2013, (*see* Dkt. No. 10). The Court also directed Gilmore-Smit to respond to Gilmore's letter by September

27, 2013.  (*See* Dkt. No. 9.)  Gilmore-Smit never responded, but she did appear by telephone at

the October 4, 2013 conference, at which conference the Parties discussed the status of the case.

(*See* Hr'g Tr. (Oct. 4, 2013 Hr'g).)  The Court stated on the record that it would hold the next

conference in the case on January 14, 2014, at 11:00 a.m., at which conference the Parties would

discuss "if there[] [were] going to be any motions."  (*Id.* at 8.)  The Court also provided

Gilmore-Smit with the telephone number for the pro se office, which the Court described to her

as "the office that's connected to the court that assists people who are representing themselves,"

and which "sometimes . . . can provide resources and answer certain basic questions."  (*Id.* at

11–12.)

       As scheduled, the Court held another conference on January 14, 2014.  (*See* Dkt. (minute

entry for Jan. 14, 2014).)  However, Gilmore-Smit failed to appear, by telephone or otherwise.

(*See id.*)  At the conference, Gilmore requested permission to file a Motion for Summary

Judgment, which request the Court granted.  (*See id.*)  On January 23, 2014, the Court issued a

Motion Scheduling Order, in which Order it directed Gilmore to file her Motion by February 18,

2014, Gilmore-Smit to file her opposition papers by March 18, 2014, and Gilmore to file her

Reply by April 1, 2014.  (*See* Dkt. No. 11.)  The Court also directed that a copy of the Order be

mailed to Gilmore-Smit.  (*See id.*)

       Gilmore filed her Motion on February 14, 2014.  (*See* Dkt. No. 15.)  Along with her

Motion, Gilmore submitted a sworn certificate stating that "a true and correct copy of the Notice

of Motion for Summary Judgment was . . . served via First Class, U.S. Mail" to Gilmore-Smit's

Brooksville, Florida address.  (*See* Dkt. No. 20.)  Yet, Gilmore-Smit did not respond in any way

to Gilmore's Motion before the March 18, 2014 deadline.  Following Gilmore-Smit's failure to

respond, and out of an abundance of caution, the Court sent another copy of its January 23, 2014

Motion Scheduling Order to Gilmore-Smit's Brooksville, Florida address on April 7, 2014. (*See* Dkt. (minute entry for April 7, 2014).) However, Gilmore-Smit still did not submit any opposition papers.

On May 23, 2014, Guardian filed a Motion through which it sought the Court's permission to deposit the Policy's proceeds into the Court's Registry. (*See* Dkt. Nos. 27–31.) On August 7, 2014, the Court issued an Order directing Defendants to submit any objections to Guardian's Motion within 10 days of the issuance of the Court's Order. (*See* Dkt. No. 32.) Having received no such objections, the Court granted Guardian's Motion on August 21, 2014, (*see* Dkt. No. 33), and Guardian deposited the Policy's proceeds into the Court's Registry on September 3, 2014, (*see* Unnumbered Dkt. Entry of September 8, 2014).

## II.  DISCUSSION

### A.  Standard of Review

Guardian and Gilmore assert that this Court has jurisdiction over this Action under the interpleader statute, 28 U.S.C. § 1335. (*See* Compl. ¶ 6 ("This Court has jurisdiction over this statutory interpleader action pursuant to the provisions of 28 U.S.C. § 1335(a) . . . ."); Aff. of Joseph M. Saffioti, Esq. ("Saffioti Aff.") ¶ 4 (Dkt. No. 16) ("This Court has jurisdiction over this statutory interpleader action pursuant to the provisions of 28 U.S.C. § 1335(a) . . . .").) An "interpleader is designed to protect stakeholders from undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit." *Fid. Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 177 (S.D.N.Y. 2002). "When faced with an interpleader action, courts generally use a two-step approach. In the first step, a court must determine whether the interpleader action is appropriate . . . ." *Metro. Life Ins. Co. v. Mitchell*, 966 F. Supp. 2d 97, 102 (E.D.N.Y. 2013)

7

(citation omitted).  "[I]f [the court] finds that the action . . . is appropriate, the plaintiff will be discharged from liability," and the court will proceed to "the second step," at which point it "adjudicates the claims among the remaining adverse parties."  *Id.* (citations omitted); *see also N.Y. Life Ins. Co. v. Conn. Dev. Auth.*, 700 F.2d 91, 95 (2d Cir. 1983) (describing two-step approach); *Union Cent. Life Ins. Co. v. Berger*, No. 10-CV-8408, 2012 WL 4217795, at *6 (S.D.N.Y. Sept. 20, 2012) (same).

### 1.  Step One of the Two-Step Interpleader Approach

"In order to determine whether an interpleader is appropriate under the first step, a court must, as an initial matter, ensure that the plaintiff has satisfied the jurisdictional requirements for bringing the action."  *Mitchell*, 966 F. Supp. 2d at 102.  Section 1335 provides in part that "[a] district court[] shall have original jurisdiction of any civil action of interpleader . . . filed by any . . . corporation . . . having issued a . . . policy of insurance . . . of $500 or more" if the following conditions are met:

> (1) Two or more adverse claimants, of diverse citizenship as defined in [28 U.S.C.
> § 1332], are claiming . . . to be entitled to . . . any one or more of the benefits arising
> by virtue of any . . . policy . . . ; and . . . (2) the plaintiff has . . . paid the amount of
> . . . or other value of such instrument or the amount due under such obligation into
> the registry of the court, there to abide the judgment of the court, or has given bond
> payable to the clerk of the court in such amount and with such surety as the court or
> judge may deem proper, conditioned upon the compliance by the plaintiff with the
> future order or judgment of the court with respect to the subject matter of the
> controversy.

28 U.S.C. § 1335(a).  Although Section 1335 references Section 1332, the latter of which "require[s] . . . complete diversity," *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013), Section 1335 "has been uniformly construed to require only 'minimal diversity,' that is, diversity of citizenship between two or more claimants, without regard to the circumstance that other rival claimants may be co-citizens," *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523,

8

530 (1967); *see also FVA Ventures, Inc. v. BMO Harris Bank, N.A.*, No. 12-CV-2876, 2012 WL 4863210, at *4 (E.D.N.Y. Oct. 12, 2012) (same); *N.Y. Life Ins. Co. v. Apostolidis*, 841 F. Supp. 2d 711, 716 (E.D.N.Y. 2012) (same).

Here, all of the prerequisites for the Court's exercise of jurisdiction have been satisfied. The Policy's initial face value was $100,000. (*See* Gilmore's 56.1 Statement ¶ 2.) Additionally, because Gilmore is a citizen of the State of New York, (*see* Saffioti Aff. ¶ 2), and Gilmore-Smit is a citizen of Florida, (*see id.* ¶ 3), the Parties are minimally diverse. Finally, Guardian has deposited the Policy's proceeds into the Court's Registry. (*See* Unnumbered Dkt. Entry of September 8, 2014.)

"Assuming the jurisdictional requirements of [Section 1335] are satisfied, the appropriateness of an interpleader action rests on whether the plaintiff has a real and reasonable fear of double liability or vexatious, conflicting claims against the single fund, regardless of the merits of the competing claims." *Mitchell*, 966 F. Supp. 2d at 102 (citations and internal quotation marks omitted) (quoting *Wash. Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993); *Fid. Brokerage Servs*, 192 F. Supp. 2d at 177); *see also United States v. Barry Fischer Law Firm, LLC*, No. 10-CV-7997, 2011 WL 31545, at *3 (S.D.N.Y. Jan. 5, 2011) (same). "[A] court need not analyze the merits of the claims[,] because the stakeholder should not be obliged at its peril to determine which of two claimants has the better claim." *Mitchell*, 966 F. Supp. 2d at 102 (some alterations and internal quotation marks omitted); *see also Citigroup Global Mkts., Inc. v. KLCC Invs., LLC*, No. 06-CV-5466, 2007 WL 102128, at *6 (S.D.N.Y. Jan. 11, 2007) (same).

Here, Guardian has alleged that it is "unable to determine to whom the amount due under the [P]olicy is payable" or "which of . . . [D]efendants is entitled to payment," and that as a

result, it "is, or may be, exposed to multiple liability." (Compl. ¶¶ 21–22.) Given that Gilmore and Gilmore-Smit both claim that they are entitled to the Policy's proceeds, Guardian's fear of double liability appears to be real and reasonable. Thus, the Court determines that this interpleader Action is appropriate.

As stated previously, by way of relief, Guardian requests (1) that Defendants be restrained from instituting or maintaining any action against Guardian for the recovery of any part of the Policy's proceeds; (2) that Defendants be required to interplead together concerning their claims to the proceeds; (3) that upon its payment of the Policy's proceeds into the Court's Registry, the Court discharge it from all further liability for such proceeds; and (4) for such other and further relief as the Court deems just and proper, together with expenses, costs, and disbursements of this Action, payable from the Policy's proceeds. (*See* Compl. 4.)

As to the first and third forms of relief that Guardian requests, 28 U.S.C. § 2361 provides the following:

> In any civil action of interpleader or in the nature of interpleader under [28 U.S.C. § 1335], a district court may . . . enter [an] order restraining [all claimants] from instituting or prosecuting any proceeding in any State or United States court affecting the property, instrument or obligation involved in the interpleader action until further order of the court. . . . Such district court . . . may [also] discharge the plaintiff from further liability, make the injunction permanent, and make all appropriate orders to enforce its judgment.

28 U.S.C. § 2361; *see also Guardian Life Ins. Co. of Am. v. St. Ange*, No. 11-CV-3468, 2012 WL 463894, at *2 (S.D.N.Y. Feb. 8, 2012).

"Of importance, [Section] 2361 enables a party meeting the requirements of [Section] 1335 to obtain a restraining order without following the procedures set forth in [Rule 65 of the Federal Rules of Civil Procedure], which normally governs the issuance of injunctive relief." *Mitchell*, 966 F. Supp. 2d at 104 (internal quotation marks omitted); *see also Bank of Am., N.A.*

*v. Morgan Stanley & Co.*, No. 10-CV-6322, 2011 WL 2581765, at *4 (S.D.N.Y. June 24, 2011)
(same). "In situations such as this one[,] where a stakeholder, faced with rival claims to the fund
itself, acknowledges [its] liability to one or the other of the claimants, it is reasonable and
sensible that interpleader should also protect the stakeholder from vexatious and multiple
litigation, and therefore[,] suits sought to be enjoined in such situations are squarely within the
language of [Section 2361]." *Bank of Am.*, 2011 WL 2581765, at *4 (some alterations and
internal quotation marks omitted) (quoting *State Farm*, 386 U.S. at 534). In such situations,
"[a]n injunction against overlapping lawsuits is desirable to [e]nsure the effectiveness of the
interpleader remedy," as such an injunction "prevents the multiplicity of actions and reduces the
possibility of inconsistent determinations." *Mitchell*, 966 F. Supp. 2d at 104 (internal quotation
marks omitted); *see also Apostolidis*, 841 F. Supp. 2d at 720 (same). Here, because the
requirements of Section 1335 have been satisfied, and because Guardian has acknowledged its
liability to one or the other of the claimants, (*see* Compl. ¶¶ 21–22), the Court hereby "restrain[s]
[all claimants to the Policy's proceeds] from instituting or prosecuting any proceeding in any
State or United States court affecting" such proceeds until further order of this Court, *see* 28
U.S.C. § 2361.

     In regard to the third form of relief that Guardian requests, "[g]enerally, once an
interpleader plaintiff has satisfied the Section 1335 jurisdictional requirements of an interpleader
claim, the court should readily grant discharge of the stakeholder, unless it finds that the
stakeholder may be independently liable to a claimant." *Mitchell*, 966 F. Supp. 2d at 103
(alterations and internal quotation marks omitted) (citing, *inter alia*, *Conn. Dev. Auth.*, 700 F.2d
at 95); *see also Apostolidis*, 841 F. Supp. 2d at 720 (same); *Bank of Am.*, 2011 WL 2581765, at
*4 (same). Because the requirements of Section 1335 have been satisfied, and because there is

11

no indication in any of the Parties' submissions that Guardian may be independently liable to any of the claimants, the Court hereby "discharge[s] [Guardian] from further liability" for such proceeds. *See* 28 U.S.C. § 2361.

As to the fourth form of relief that Guardian requests, the Court notes that, as a general matter, "a district court has discretion to award reasonable attorneys' fees and costs to a disinterested stakeholder in an action brought under the interpleader statute." *Hartford Life Ins. Co. v. Pottorff*, No. 13-CV-77, 2014 WL 1393751, at *6 (N.D.N.Y. Apr. 9, 2014) (internal quotation marks omitted); *see also N.Y. Life Ins. Co. v. Aleandre*, No. 13-CV-2384, 2014 WL 30508, at *4 (S.D.N.Y. Jan. 2, 2014) (same). However, "the decision to award fees and costs is left to the sound discretion of the district court," and "courts need not award attorneys' fees in interpleader actions where the fees are expenses incurred in the ordinary course of business." *Mitchell*, 966 F. Supp. 2d at 104 (alterations and internal quotation marks omitted); *see also Feehan v. Feehan*, No. 09-CV-7016, 2011 WL 497852, at *7 (S.D.N.Y. Jan. 10, 2011) (same), *adopted by* 2011 WL 497776 (S.D.N.Y. Feb. 10, 2011).

"This is particularly true in the case of insurance companies, where minor problems that arise in the payment of insurance policies must be expected and the expenses incurred are part of the ordinary course of business." *Mitchell*, 966 F. Supp. 2d at 104 (internal quotation marks omitted); *see also Apostolidis*, 841 F. Supp. 2d at 721 (same). "As a result, courts in this Circuit have typically declined to award insurance companies attorneys' fees and costs in interpleader actions." *Feehan*, 2011 WL 497852, at *7; *see also Pottorff*, 2014 WL 1393751, at *7 (declining to award an insurance company attorneys' fees and costs in a "straightforward interpleader action over a modest fund" where the insurance company "did not incur any unique expenses"); *Mitchell*, 966 F. Supp. 2d at 105 (declining to award an insurance company

attorneys' fees and costs where the insurance company "did not incur any unique expenses," and adopting the view that interpleader actions "are brought primarily in the [insurance] company's own self-interest," as such actions "relieve[] the insurance company of multiple suits and eventuates in its discharge" (alterations and internal quotation marks omitted)); *cf. Travelers Indem. Co. v. Israel*, 354 F.2d 488, 490 (2d Cir. 1965) ("We are not impressed with the notion that whenever a minor problem arises in the payment of insurance policies, insurers may, as a matter of course, transfer a part of their ordinary cost of doing business of their insureds by bringing an action for interpleader.").

Here, Guardian has not identified any unique expenses that it has incurred in connection with litigating this Action, nor any other special circumstances tending to suggest that the Court should depart from the established practice among district courts within the Second Circuit of declining to award attorneys' fees and costs to similarly situated insurance companies. As such, the Court denies Guardian's request for reimbursement from the Policy's proceeds.

Having found that this Action is appropriate, and having addressed Guardian's requested relief, the Court now proceeds to an adjudication of the claims among the remaining adverse parties.[1]

### 2.  Step Two of the Two-Step Interpleader Approach

#### a.  Standard of Review

Before the Court is Gilmore's Motion for Summary Judgment. Summary judgment shall be granted where the movant shows that there is "no genuine dispute as to any material fact and

---

[1] Given that Gilmore and Gilmore-Smit have both asserted claims to the Policy's proceeds within the context of this Action, the second form of relief that Guardian requests appears to be moot. In any event, it is largely duplicative of the first.

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

"In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No. 1*, — F. Supp. 2d —, 2014 WL 1621292, at *12 (S.D.N.Y. Apr. 22, 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it

14

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) (internal quotation marks and emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, *inter alia*, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

As noted above, Gilmore-Smit has not opposed Gilmore's Motion for Summary Judgment. In *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004), the Second Circuit "clarif[ied] the procedure to be followed when a motion for summary judgment is unopposed," and emphasized that "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law" under such circumstances:

> This Court has made clear . . . that where the non-moving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. If the evidence submitted in support of the summary judgment

motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.  Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion.

*Id.* at 242, 244 (citations, internal quotation marks, and emphasis omitted).

### b.  Choice of Law

"In federal interpleader actions where jurisdiction is based on a diversity of citizenship, like the instant action, courts apply the [choice-of-law rules] of the forum state." *Ministers & Missionaries Benefit Bd. v. Estate of Clark Flesher*, No. 11-CV-9495, 2014 WL 1116846, at *5 (S.D.N.Y. Mar. 18, 2014); *see also Union Cent. Life Ins. Co.*, 2012 WL 4217795, at *8 n.11 (applying the forum state's choice-of-law rules in an interpleader action under 28 U.S.C. § 1335).  Here, that state is New York.

Although "New York courts will generally enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction," *see Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, — F. Supp. 2d —, 2014 WL 1642970, at *3 n.5 (S.D.N.Y. Apr. 23, 2014) (internal quotation marks omitted), neither Guardian nor Gilmore has provided the Court with a copy of the Policy, and as a result, the Court is unable to determine whether it contains such a clause.  But regardless, "even when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law." *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991); *see also Wesco Distrib., Inc. v. Anshelewitz*, No. 06-CV-13444, 2008 WL 2775005, at *4 (S.D.N.Y. July 16, 2008) (same).  "Such conduct indicating the parties' consent to a given state's substantive law can consist of the cases cited and relied upon by the parties in their briefs . . . ." *Digital Camera*

16

*Int'l Ltd. v. Antebi*, No. 11-CV-1823, 2014 WL 940723, at *3 (E.D.N.Y. Mar. 11, 2014) (internal

quotation marks omitted); *see also Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d

Cir. 2009) ("The parties' briefs assume that New York substantive law governs the issues

presented here, and such implied consent is, of course, sufficient to establish the applicable

choice of law." (alterations and internal quotation marks omitted)); *Fed. Ins. Co. v. Marlyn*

*Nutraceuticals, Inc.*, No. 13-CV-137, 2013 WL 6796162, at *3 n.7 (E.D.N.Y. Dec. 19, 2013)

("The Court will assume that New York law applies given the parties' briefs."); *Dulsky v.*

*Worthy*, No. 11-CV-4925, 2013 WL 4038604, at *5 n.4 (S.D.N.Y. July 30, 2013) ("[B]ecause

the parties cite only New York law in their briefs, the Court will apply New York law . . . .").

Such conduct may also consist of the parties' "apparent decision not to raise the choice-of-law

issue."  *Antebi*, 2014 WL 940723, at *3 (internal quotation marks omitted); *see also Li & Fung*

*(Trading) Ltd. v. Contemporary Streetwear, LLC*, No. 11-CV-2022, 2013 WL 3757080, at *5 n.4

(S.D.N.Y. June 6, 2013) ("Plaintiff's [submissions] are entirely silent on the issue of choice of

law.  Defendants are also silent on the subject.  Under the circumstances, it is appropriate for the

Court to apply New York law—the law of the forum state—to Plaintiff's . . . claims."), *adopted*

*by* 2013 WL 3744119 (S.D.N.Y. June 28, 2013).

    Here, the only two Parties to cite to any law at all, Guardian and Gilmore, have indicated

their assent to the application of New York law by citing exclusively to New York statutes and

cases.  (*See* Compl. ¶ 19 (citing to a provision of New York insurance law); Gilmore Mem. at

unnumbered 3–5 (citing only New York cases).)  Additionally, by not citing to any law or filing

any response to Gilmore's Motion, Gilmore-Smit and Applebee-McPhillips have indicated their

assent to the application of the law of the forum state.  *Cf. Lenard v. Design Studio*, 889 F. Supp.

2d 518, 528 n.5 (S.D.N.Y. 2012) (applying the law of the forum state where the plaintiff cited no

law in her default-judgment submissions and the defendants did not file any response thereto).

Consequently, the Court will apply New York law to Gilmore's Motion.

### c.  Decedent's Competence To Change the Policy's Beneficiary

Gilmore's primary argument as to why summary judgment should be entered in her favor

as to the first fact in dispute is that "a party alleging lack of legal capacity bears the burden of

proving incompetence."  (Gilmore's Mem. 4.)  Gilmore argues that, although "Gilmore-Smit

alleges that [Decedent] lacked capacity" to execute the Form, she "has failed to provide any

evidence to support her claim," and has thus failed to carry her burden.  (*Id.*)

In contract cases, "New York presumes that a person is 'competent at the time of the

performance of the challenged action and the burden of proving incompetence rests with the

party asserting incapacity.'"  *Liberty Life Assurance Co. of Bos. v. Bahan*, No. 09-CV-4715,

2010 WL 3431147, at *3 (S.D.N.Y. Aug. 23, 2010) (quoting *Sears v. First Pioneer Farm Credit,

ACA*, 850 N.Y.S.2d 219, 222 (App. Div. 2007)), *aff'd*, 441 F. App'x 21 (2d Cir. 2011); *see also

In re DelGatto*, 950 N.Y.S.2d 738, 741 (App. Div. 2012) ("[C]ompetence to engage in a

transaction is presumed, and the objecting party must prove lack of competence."); *In re Nealon*,

870 N.Y.S.2d 578, 580 (App. Div. 2008) ("A person's competency to engage in a transaction is

presumed and the party challenging such bears the burden of proving incompetence.").  But in

probate cases, "[i]t is the indisputable rule . . . that the proponent [of a will] has the burden of

proving that the testator possessed testamentary capacity."  *In re Estate of Alibrandi*, 960

N.Y.S.2d 760, 762 (App. Div. 2013) (alterations and internal quotation marks omitted) (quoting

*Estate of Kumstar*, 487 N.E.2d 271, 272 (N.Y. 1985)); *see also In re Estate of Prevratil*, —

N.Y.S.2d —, 2014 WL 3629977, at *1 (App. Div. July 24, 2014) ("[A]ddressing the challenge to

decedent's testamentary capacity, the burden rested with the proponents . . . ."); *In re Estate of*

18

*Buchting*, 975 N.Y.S.2d 794, 798 (App. Div. 2013) ("[I]t was petitioner's burden to establish that decedent possessed the requisite testamentary capacity."). Although courts applying New York law treat life-insurance policies as contracts for many purposes, *see, e.g.*, *Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 525 (S.D.N.Y. 2010) (applying principles of contract interpretation to a life-insurance policy); *Nocella v. Fort Dearborn Life Ins. Co. of N.Y.*, 955 N.Y.S.2d 66, 69–70 (App. Div. 2012) (same), the Second Circuit suggested more than 50 years ago in a short per curiam opinion that such policies are more like wills than contracts for the purpose of assigning the burden of proving capacity or competence to change them.

In the district-court action underlying *Travelers Insurance Co. v. Childs*, 272 F.2d 855 (2d Cir. 1959) (per curiam), an insurer brought an action to determine the beneficiaries of a decedent's life-insurance policy. *Id.* at 856. Three defendants claimed the fund, two of whom the decedent had designated as the fund's beneficiaries by executing a change-of-beneficiary form before he died. *Id.* The district court held that New York law "forced him to find that the [decedent] was presumed to be mentally competent to execute a change of beneficiary," but then applied that standard to find that the change of beneficiary "had been made by a person who did not know what he was doing, and in the presence, and under the influence, of the alleged beneficiaries." *Id.* (internal quotation marks omitted). Accordingly, the district court "awarded the proceeds of the policy to the administratrix," and the designated beneficiaries appealed. *Id.*

The Second Circuit upheld the district court's ruling. *Id.* However, en route to doing so, it disagreed with the district court as to where the relevant burden lay:

> It is well settled law in New York that the proponent of a testamentary disposition has the burden of proving the mental capacity of the testator. Therefore, we may not reverse the judgment unless we are satisfied that the claimants . . . so plainly proved that the insured had the required capacity to change the beneficiary that it was clearly erroneous to hold otherwise.

19

*Id.* (citation omitted).  In so holding, the court did not cite to any New York cases applying the law governing testamentary dispositions to life-insurance policies.  Instead, it cited to a single case that the Appellate Division decided in 1946, which involved a will, not a life-insurance policy, and in which the court merely stated the "well-settled" rule described above—that "in a will contest the burden of proving testamentary capacity is upon the proponent."  *Id.* (citing *In re Morrison's Will*, 60 N.Y.S.2d 546, 549 (App. Div.), *aff'd*, 69 N.E.2d 814 (N.Y. 1946)).

The Court has been unable to locate a single case decided before *Childs*, or in the 55 years since, in which a court applied the probate standard, as opposed to the contract standard, to a life-insurance policy.[2]  To the contrary, in all three cases the Court found in which the subject was discussed—two from the Southern District of New York and one from a New York state supreme court—the courts applied the contract standard in holding that a decedent is presumed to have been competent to change the beneficiary of a life-insurance policy.  In fact, the Second Circuit affirmed both district court decisions.  *See Sun Life Assurance Co. of Can. (U.S.) v. Gruber*, No. 05-CV-10194, 2007 WL 4457771, at *14 (S.D.N.Y. Dec. 14, 2007) (holding that "[u]nder New York law, parties to any contract are presumed to be competent, and a party asserting incapacity has the burden of proving incompetence" in a case in which a party claimed that the decedent had not been competent to change the beneficiary of his life-insurance policy), *aff'd sub nom. Sun Life Assurance Co. of Can. v. Gruber*, 334 F. App'x 355 (2d Cir. 2009); *Provident Mut. Life Ins. Co. of Phil. v. Vergara*, No. 91-CV-5657, 1995 WL 571874, at *1 (S.D.N.Y. Sept. 27, 1995) (finding that certain claimants to the proceeds of a life-insurance policy, who were the original beneficiaries of the policy before the decedent signed a change of

---

[2] It is worth noting that *Childs* has been cited 10 times in published cases since it was decided, but never for its discussion of the burden of proof.

beneficiary form, and who claimed that the decedent "was too severely ill to be competent when he signed" it, had "failed to meet their burden of proof"), *aff'd sub nom. Provident Mut. Life Ins. Co. of Phil. v. Mariano*, 104 F.3d 350 (2d Cir. 1996) (unpublished table decision); *Vermylen v. Genworth Life Ins. Co. of N.Y.*, 960 N.Y.S.2d 342 (Sup. Ct. 2010) (unpublished table decision) (holding that "[a] person is presumed to be competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity" in a case in which a party claimed that the decedent had not been competent to change the beneficiary of his life-insurance policy); *cf. Liberty Life Assur. Co. of Bos. v. Bahan*, No. 09-CV-4715, 2010 WL 3431147, at *3 (S.D.N.Y. Aug. 23, 2010) (holding that "New York presumes that a person is competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity" in a case in which the defendant claimed that the decedent had not been competent to change the beneficiary of his insurance annuity (internal quotation marks omitted)), *aff'd*, 441 F. App'x 21 (2d Cir. 2011); *In re Estate of Neill*, 954 N.Y.S.2d 760 (Sur. 2012) (describing the putative change of the beneficiary of the decedent's life-insurance policy as a "non-probate transfer[]").

"Notwithstanding" that the cases described above are in tension with *Childs*, "the Second Circuit has not overruled [*Childs*], and thus it constitutes binding precedent that this Court must follow." *In re Procel*, 467 B.R. 297, 305 (S.D.N.Y. 2012); *see also Thompson v. Pallito*, 949 F. Supp. 2d 558, 574–75 (D. Vt. 2013) (following a Second Circuit decision because no subsequent Second Circuit decision had "explicitly overruled" it, even though there had been "considerable debate and disagreement within [the] circuit as to how much of the [decision's] test remain[ed] viable"); *Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*, No. 08-CV-9710, 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009) ("This Court is bound to follow controlling Second

21

Circuit precedent unless that precedent is overruled or reversed—even if, as here, the precedent has been criticized by scholars and certain courts in other Circuits."); *Chem. Bank N.Y. Trust Co. v. United States*, 249 F. Supp. 450, 456–57 (S.D.N.Y. 1966) ("While Judge Hand's formulation has been limited in applicability and his intent to set it down as a rigid rule questioned in this circuit [by Judge Friendly], it has not been overruled, and this court feels constrained to follow it." (citation omitted)).  *Childs* stands for the proposition that, under the Second Circuit's binding, if arguably outdated, interpretation of New York law, where a claimant to the proceeds of a decedent's life-insurance policy stakes her claim on the decedent's change of the policy's beneficiary, the claimant bears the burden of proving that the decedent had the testamentary capacity to make that change.[3]

"The [capacity] standard for making a will is less rigorous" than the competence standard for making a contract, as a will is "sometimes made by a person who is ill and facing death." *Rudolf Nureyev Dance Found. v. Noureeva-Francois*, 7 F. Supp. 2d 402, 416 (S.D.N.Y. 1998); *see also In re Estate of Curtis*, 975 N.Y.S.2d 708 (Surr. Ct. 2013) (unpublished table decision) ("[I]t is clear that less capacity is required to execute a will than a contract or any other legal document." (citing *In re Coddington's Will*, 118 N.Y.S.2d 525 (App. Div. 1952), *aff'd*, 120 N.E.2d 777 (N.Y. 1954)); *In re Estate of Gary*, 961 N.Y.S.2d 358 (Surr. Ct. 2012) (unpublished table decision) (same).  New York courts describe the governing standard as "minimal."  *Matter*

---

[3] The Court notes that, because the state-court decision that conflicts with *Childs* was not decided by the New York Court of Appeals, the situation here differs from that presented in cases like *Prestige Builder & Management LLC v. Safeco Insurance Co. of America*, 896 F. Supp. 2d 198 (E.D.N.Y. 2012), where conflicting decisions from the Second Circuit and the New York Court of Appeals left the district court "in the undesirable position of choosing between dueling pronouncements of New York law made by two Courts to whom it [was] obliged to defer."  *Id.* at 205 (internal quotation marks omitted); *see also Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 257 (S.D.N.Y. 2012) (same).

*of Demaio*, 43 Misc. 3d 1218(A) (Surr. Ct. 2014) (citing *In re Coddington's Will*, 118 N.Y.S.2d at 525); *In re Will of Iwachiw*, 975 N.Y.S.2d 366 (Surr. Ct. 2013) (same) (unpublished table decision).  A court attempting to determine whether a decedent had testamentary capacity under New York law looks to three factors: "(1) whether he understood the nature and consequences of executing a will; (2) whether he knew the nature and extent of the property he was disposing of; and (3) whether he knew those who would be considered the natural objects of his bounty and his relations with them."  *In re Estate of Alibrandi*, 960 N.Y.S.2d at 762 (alterations, citations, and internal quotation marks omitted) (quoting *Estate of Kumstar*, 487 N.E.2d at 272); *see also In re Estate of Prevratil*, 2014 WL 3629977, at *1 (same).  "Mere proof that the decedent suffered from old age, physical infirmity and dementia when the will was executed is not necessarily inconsistent with testamentary capacity and does not alone preclude a finding thereof."  *In re Estate of Alibrandi*, 960 N.Y.S.2d at 762 (alterations and internal quotation marks omitted) (quoting *In re Estate of Williams*, 787 N.Y.S.2d 444, 447 (App. Div. 2004)).  Rather, "the appropriate inquiry is whether the decedent was lucid and rational at the time the will was made."  *Id.* (internal quotation marks omitted) (quoting *In re Estate of Williams*, 787 N.Y.S.2d at 447).

"Where there is direct evidence that the decedent possessed the understanding to make a testamentary disposition, even medical opinion evidence assumes a relatively minor importance."  *Id.* (internal quotation marks omitted) (quoting *In re Estate of Makitra*, 956 N.Y.S.2d 780 (App. Div. 2012)).  Indeed, although the initial burden of establishing testamentary capacity rests with the proponent of the will, if the proponent "present[s] . . . affidavit[s] of . . . attesting witnesses stating that decedent was of sound mind and memory and was competent to make a will," "[t]his [c]reate[s] a presumption of testamentary capacity,"

which shifts the burden to the party disputing the decedent's capacity.  *In re Estate of Walker*, 914 N.Y.S.2d 379, 381 (App. Div. 2011); *see also In re Estate of Prevratil*, 2014 WL 3629977, at *1 ("[T]he proponents offered the self-executing affidavit of the attesting witnesses, who opined that decedent was of sound mind and memory and in all respects competent to make a will.  This . . . created a presumption of testamentary capacity."); *In re Estate of Scaccia*, 891 N.Y.S.2d 484, 488 (App. Div. 2009) (finding that "the affidavit of the attesting witnesses stating that decedent was sound in mind and memory and in all respects competent to make a will created a presumption of testamentary capacity," which, along with other evidence in the record, "was sufficient to shift the burden to respondent to produce evidence creating a triable issue of fact"); *In re Estate of Ruparshek*, 828 N.Y.S.2d 623, 624 (App. Div. 2007) ("[P]etitioner offered the affidavit and testimony of the subscribing witnesses who stated that decedent was of sound mind and memory when she executed the will.  This evidence met petitioner's initial burden and created a presumption of testamentary capacity."); *In re Probate Proceeding, Will of Haynes*, 938 N.Y.S.2d 227 (Surr. Ct. 2011) (unpublished table decision) ("Where proponent presents evidence of testamentary capacity, objectant must rebut such proof with evidence of lack of capacity.").

Here, the affidavits that Gilmore submitted in support of her Motion for Summary Judgment are sufficient to create a presumption that Decedent had testamentary capacity when he signed the Form.  Gilmore submitted three relevant affidavits.  The first is from Mosner, "a Notary Public registered in the State of New Jersey" who is "employed as the Secretary to the Superintendent of the Newton School District," where Decedent worked as a school custodian. (Mosner Aff. ¶¶ 1–2.)  According to Mosner's affidavit, on April 20, 2012, she was "asked by [her] superior . . . to notarize a document for" Decedent at the Merriam Avenue School in New

Jersey, and thereafter drove to the school and met Decedent and Gilmore in the cafeteria.

(*Id.* ¶ 3.)  Decedent then asked Mosner "to notarize a document which [Decedent] told [her] was

a change of beneficiary for his life insurance."  (*Id.* ¶ 4.)  "Based on [Mosner's] conversation

with [Decedent] he executed the change of beneficiary form in front of [her] and [she] had no

reason to question his competence."  (*Id.*)  Further, "[a]t no time during that meeting on April 20,

2012 did [Mosner] feel or see any coercion or influence from [Gilmore] on [Decedent]

concerning the execution of the change of beneficiary form."  (*Id.* ¶ 5.)  Mosner was not even

aware that Decedent "was suffering from a fatal illness" during that meeting, even though she

"was responsible for staff attendance for the school district," as Decedent "had been routinely

working in his position as a custodian."  (*Id.* ¶ 6.)

Gilmore also addresses Decedent's capacity to execute the Form in her own affidavit.  In

describing her husband's liver cancer, Gilmore states that, throughout the course of Decedent's

illness, "the only time he was taking morphine for pain was during the last week of his life in

January 2013"—more than eight months after he signed the Form.  (Gilmore Aff. 2.)

Additionally, Gilmore states that her "husband had full mental capacity during his illness until

the winter of 2013–2014."  (*Id.*)[4]  Gilmore acknowledges that, "[a]s part of his illness for short

periods typically lasting less than several hours [Decedent] would develop ammonia on his

brain," but notes that it "would only temporarily incapacitate him."  (*Id.*)

The third affidavit that Gilmore submitted is from Irene Lynn Labate Vanatta

("Vanatta"), who is Gilmore-Smit's sister and Decedent's aunt.  (Vanatta Aff. ¶ 1.)  Vanatta was

---

[4] Gilmore's listing of the years 2013–14 instead of 2012–13 appears to have been due to a typographical error, as she states elsewhere in her affirmation that Decedent died in January 2013.  (*See* Gilmore Aff. 2.)

"a New York State Licensed Registered Nurse from 1975 until 2004 when [she] retired," which experience she claims "gave [her] great insight into the nature of [Decedent's] illness." (*Id.* ¶¶ 3, 5.) Vanatta "knew [Decedent] from his birth until the time of his death." (*Id.*) She claims that she and Decedent "had a close relationship . . . during his entire life." (*Id.* ¶ 4.) Vanatta lived "in close proximity to [Decedent]," and "in particular spent many hours with him during his illness." (*Id.* ¶¶ 2, 4.) Specifically, she "frequently accompanied [Decedent] to his appointments with his physicians in New York City," and "was present during his examinations with his doctors and discussed his disease and treatments with [them]." (*Id.* ¶ 5.)

Regarding the ammonia on Decedent's brain, Vanatta states that "[t]he condition was only temporary and short lived lasting less than several hours." (*Id.* ¶ 6.) According to Vanatta, "[a]t no time from 2008 during his initial diagnoses with his disease until the fall of 2012 did [Decedent] loose [sic] his mental capacity or his ability to make decisions." (*Id.*) Later in her affidavit, she reiterates that, "[d]uring the period of 2008 to his retirement in 2012 [Decedent] was working full time, was not on pain medication and had full mental capacity." (*Id.* ¶ 9.)[5] Vanatta bases her opinion that Decedent's disease "had no impact on his mental capacity" not only on her personal observations of him, but also on her "discussions with his doctors and [her] knowledge as a Registered Nurse." (*Id.* ¶ 10.) She also recalls that, "[d]uring the period of March through April 2012 while traveling to New York City with [Decedent] for his treatment, [he] discussed with [her] his financial affairs and told [her] he intended to change his [l]ife [i]nsurance [b]eneficiary from his mother to his wife," and that "he wanted his affairs in order." (*Id.* ¶ 8.)

---

[5] In her affidavit, Gilmore states that Decedent retired in June 2012, approximately two months after he signed the Form. (Gilmore Aff. 1.)

To summarize, only two people besides Decedent appear to have been present when he signed the Form. The first was Gilmore, who is undoubtedly an interested party. The second was Mosner, a disinterested witness. *See In re Estate of Makitra*, 956 N.Y.S.2d at 782 (emphasizing "the trial testimony of several disinterested witnesses to [the] effect" that "decedent was of sound mind and memory when he executed" a will); *In re Elkan*, 923 N.Y.S.2d 495, 495 (App. Div. 2011) (emphasizing "[t]he testimony of . . . disinterested witnesses" in finding that "[t]he proponent of the will failed to sustain his burden of showing that the testator possessed testamentary capacity"). Both Gilmore and Mosner testified that Decedent had, or at least appeared to have, full mental capacity at the time he signed the Form. Further, their testimony is corroborated by that of Vanatta. While Vanatta was not present when Decedent signed the Form, she did testify that Decedent had full mental capacity during the relevant time period. What is more, Vanatta also testified that Decedent discussed with her his intent to sign the Form in the weeks before he actually did so. *See In re Estate of Alibrandi*, 960 N.Y.S.2d at 762–63 (finding significant that a proponent of a will submitted evidence that the will "was the culmination of several months of discussions" in determining that the decedent had testamentary capacity); *In re Probate Proceeding, Will of Feinberg*, 961 N.Y.S.2d 360 (Surr. Ct. 2012) (unpublished table decision) (finding that "a prima facie case of testamentary capacity" had been "establish[ed]" in part because "over a several month period discussions were held as to the terms of the proposed wills"). It also bears mentioning that Vanatta is Gilmore-Smit's sister. Thus, it could be argued that, to the extent Vanatta is at all biased, she would be biased in her sister's favor. At the very least, no evidence in the record suggests that Vanatta is biased towards Gilmore. For all of these reasons, the affidavits from Mosner, Gilmore, and Vanatta are

collectively sufficient to establish a presumption that Decedent had testamentary capacity when he signed the Form.

There is no evidence in the record that rebuts this presumption. The only submission that Gilmore-Smit has made in this Action is the letter she filed on June 24, 2013, in which she stated that she "think[s]" that, in the months leading up to Decedent's death, Decedent "was on heavy doses of morphine due to . . . ammonia on the brain," and that as a result, "he was not of sound mind," and "unknowingly signed something . . . which changed the beneficiary or gave someone power of attorney to do so." (June 24 Gilmore-Smit Letter.) As an initial matter, these unsworn statements are not evidence on which the Court may rely in deciding Gilmore's Motion for Summary Judgment. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact when none would otherwise exist." (alterations and internal quotation marks omitted)). Moreover, even if the Court could consider these unsworn statements as evidence, they would be evidence only of Gilmore-Smit's unsubstantiated suspicions, not her direct observations. Gilmore-Smit's complete lack of knowledge as to the pertinent facts is evidenced by her expressed "hope that the courts will pull [Decedent's] medical records and the records of who changed the beneficiary on the insurance policy in regards to his mental state and the legality of the change of the beneficiary." (June 24 Gilmore-Smit Letter.) This lack of knowledge is further suggested by Gilmore's affidavit, in which she states that, "during [her] husband's illness from 2008 to his death," Gilmore-Smit "had limited contact with him as she resided in the State of Florida and only came to New York for several weeks each summer." (Gilmore Aff. 2.) And in any event, Gilmore-Smit's suspicions are directly

28

contradicted by the affidavits of three people who actually had the opportunity to observe Decedent's mental state before, during, and after the April 20, 2012 meeting.

Because the evidence that Gilmore has submitted establishes a presumption of testamentary capacity, the burden of proof falls on Gilmore-Smit to rebut that presumption. *See In re Estate of Scaccia*, 891 N.Y.S.2d at 488; *Will of Haynes*, 938 N.Y.S.2d 227. As noted, "when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs.*, 735 F.3d at 123 (alterations and internal quotation marks omitted). Additionally, the nonmoving party "need[s] to create more than a metaphysical possibility that [her] allegations were correct; [s]he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel*, 692 F.3d at 30 (internal quotation marks and emphasis omitted), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker*, 2014 WL 1244778, at *5 (internal quotation marks omitted). Here, Gilmore has "point[ed] to a lack of evidence to go to the trier of fact on an essential element of" Gilmore-Smit's claim; specifically, that Gilmore-Smit has not put forth any evidence whatsoever suggesting that Decedent lacked capacity to change the Policy's beneficiary.

As stated, it is undisputed that Decedent changed the Policy's beneficiary from Gilmore-Smit to Gilmore in April 2012. (*See* Gilmore's 56.1 Statement ¶ 5; Change of Beneficiary Form; June 24 Gilmore-Smit Letter.) None of the Parties has challenged Decedent's right to make this change under New York law or per the Policy's terms. Therefore, because Gilmore has submitted sufficient evidence to create a presumption of testamentary capacity, and because

Gilmore-Smit has failed to come forward with any admissible evidence sufficient to raise an issue as to whether she would be able to rebut that presumption at trial, the Court grants Gilmore's Summary Judgment Motion as to the first fact in dispute.

### d.  Gilmore's Payment of the Applebee-McPhillips Funeral Bill

At this time, the Court is unable to find that there is no genuine issue of material fact as to the second fact in dispute, whether "the Applebee-McPhillips funeral bill was paid in full out of [Gilmore's] personal funds."  (Gilmore's 56.1 Statement ¶ 10.)  As noted above, Gilmore has submitted what appears to be a May 13, 2013 funeral bill from Applebee-McPhillips, at the bottom of which Applebee-McPhillips appears to state, "Thank you, the funeral expenses for Robert are paid in full."  (*See* Funeral Bill.)  However, "the principles governing admissibility of evidence do not change on a motion for summary judgment," and as a result, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . . ." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (alterations and internal quotation marks omitted).  "[A] statement made by a person while not testifying . . . , offered . . . to prove the truth of the matter asserted in [that] statement, is hearsay," which hearsay is "generally . . . inadmissible if it does not fall within an exception provided by [Federal Rules of Evidence] 803 or 804." *United States v. Gupta*, — F.3d —, 2014 WL 1193411, at *17 (2d Cir. Mar. 25, 2014) (citing Fed. R. Evid. 801(a)–(c), 802, 803, 804).  Here, the funeral bill is hearsay, as it is being offered to prove the truth of the matter asserted therein—namely, that Gilmore paid the funeral bill in full.

The funeral bill could potentially be admissible under the hearsay exception for "records of a regularly conducted activity" codified by Rule 803(6) of the Federal Rules of Evidence, often referred to as the "business records exception," *see, e.g.*, *United States v. Kaiser*, 609 F.3d

556, 574 (2d Cir. 2010), which provides for the admission of "[a] record of an act, event, condition, opinion, or diagnosis" under the following conditions:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with [Federal Rule of Evidence] 902(11) or (12) or with a statute permitting certification; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

But Gilmore has failed to satisfy the fourth condition for the admissibility of a business record under Rule 803(6), as she has not demonstrated compliance with the first three conditions through the testimony of the funeral bill's custodian or another qualified witness, or through the type of certification that the Rule describes. *See Djangmah v. Falcione*, No. 08-CV-4027, 2013 WL 6388364, at *6 (S.D.N.Y. Dec. 5, 2013) ("[T]he introducing party must lay a foundation to introduce hearsay evidence under Rule 803(6)[, and] . . . Rule 803(6) explicitly requires that this foundation be laid by a 'custodian' or 'qualified witness,' if testimonial, or by a formal certification by the record's custodian."); *see also F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 308 n.26 (S.D.N.Y. 2008) (refusing to consider certain information submitted in support of a party's summary-judgment motion under the business-records hearsay exception because the party seeking to rely on such information "ha[d] not submitted the necessary foundation testimony" through the "testimony of the custodian or other qualified witness or

31

certification under Rules 902(11) or 902(12)" (alterations and internal quotation marks omitted)).

Additionally, although Gilmore asserts in her Rule 56.1 statement that "the Applebee-McPhillips funeral bill was paid in full out of her personal funds," and that "Applebee-McPhillips no longer has any rights to any portion of the insurance proceeds," the Second Circuit has held that, when a motion for summary judgment is unopposed, "in determining whether the moving party has met [her] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement," but instead "must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear*, 373 F.3d at 244; *see also Aurora Commercial Corp.*, 2014 WL 1386633, at *2 (same). And although Gilmore also asserts in her Rule 56.1 Statement that the fact that the Applebee-McPhillips funeral bill was paid in full out of her personal funds is "stated in [her] affidavit . . . submitted herewith," (*see* Gilmore's Rule 56.1 Statement ¶ 10), no mention of the funeral bill appears anywhere therein, (*see* Gilmore Aff.). For that matter, Gilmore does not even mention the funeral bill in her Memorandum of Law. (*See* Gilmore's Mem.)

Therefore, because Gilmore has not provided the Court with any admissible evidence proving that the Applebee-McPhillips funeral bill was paid in full out of her personal funds, she has failed to carry her burden of showing that no genuine dispute exists as to that fact, and the Court is unable to enter judgment in her favor on that issue. *See Vt. Teddy Bear*, 373 F.3d at 244 ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." (emphasis and internal quotation marks omitted)). However,

32

the Court's denial of Gilmore's Motion in this regard is without prejudice, and she may renew such Motion at a later date should she so desire.

III.  CONCLUSION

For the foregoing reasons, the Court orders that all claimants to the Policy's proceeds are hereby restrained from instituting or prosecuting any proceeding in any state or United States court affecting such proceeds until further order of this Court, and discharges Guardian from further liability for such proceeds.  Additionally, the Court grants Gilmore's Motion in regard to her claim against Gilmore-Smit, finding that there is no genuine issue of material fact as to Decedent's testamentary capacity to change the Policy's beneficiary from Gilmore-Smit to Gilmore, but denies without prejudice to renewal at a later date Gilmore's Motion in regard to her claim against Applebee-McPhillips, based on Gilmore's failure to provide the Court with sufficient admissible evidence.  However, given that the Assignment that Applebee-McPhillips filed with Guardian was for only $7,475 of the Policy's proceeds, the Clerk of Court is respectfully requested to pay all but $7,475 of the money that Guardian has deposited in the Court's Registry in connection with this Action to Gilmore.  The Court will maintain the remaining $7,475 in its Registry until such time as the dispute over the funeral expenses is resolved.  Given the inadmissible evidence that Gilmore submitted, as well as Applebee-McPhillips' failure to appear in this Action, Gilmore may want to consider seeking Applebee-McPhillips' voluntary withdrawal of its claim to $7,475 of the Policy's proceeds, or a default judgment against Applebee-McPhillips for the same amount.

The Clerk of Court is respectfully requested to terminate the pending Motion.  (*See* Dkt. Nos. 15, 20.)

SO ORDERED.

Dated:    September ____, 2014
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

34